IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN HOBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:24-cv-667-ECM |
| | ) | [WO] |
| DONALD VALENZA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

John Hobson ("Hobson") alleges that on February 14, 2024, while he was a pretrial detainee in the custody of the Houston County Jail (the "Jail"), he was attacked by other detainees. According to Hobson, the other detainees were able to attack him because of Houston County Sheriff Donald Valenza's ("Valenza") and the Houston County Commission's (the "Commission") deliberate indifference to the risks posed by the condition of the locks at the Jail, which Hobson claims amounts to violations of the Fourteenth Amendment to the United States Constitution.[1]

Hobson, Valenza, and the Commission have filed cross-motions for summary judgment on those claims. (Docs. 52, 61, 64).[2] All three of the motions are fully briefed

---

[1] Hobson also sued David Asbill and Kelita Moore under § 1983 for deliberate indifference by failure to protect (Counts II & III). (*See* doc. 33 at 11–14). He likewise sued James Brazier under a similar theory for inadequate supervision of Asbill, Moore, and other staff (Count IV). (*See id.* at 15–16). Further, Hobson sued his alleged assailants, Vazarius Tyrell James and James Maurice Tanner for battery (Count VI). (*See id.* at 18–19). Hobson filed notices of voluntary dismissal as to these defendants, (docs. 38, 41, 67), and the Court acknowledged their dismissal by operation of Rule 41, (docs. 42 & 70).

[2] For clarity, the Court refers to the document and page numbers generated by CM/ECF (including on deposition transcripts).

and ripe for review.  Based on a thorough review of the record, briefs, and applicable law, and for the following reasons, the Court finds Hobson's motion is due to be DENIED, Valenza's motion is due to be GRANTED, and the Commission's motion is due to be DENIED.

## I.  JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II.  STANDARD OF REVIEW

### A.    Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)).  Where there are cross-motions for summary judgment, "the facts are viewed in the light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citing *Am. Bankers Ins. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  However, "'conclusory allegations without specific supporting facts have no probative value.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (quoting

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (holding that the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and must identify the portions of the record that support this proposition. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

The burden then shifts to the nonmoving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12 (citing *Celotex*, 477 U.S. at 324). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Nonmovants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the

3

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).  Nonetheless, even where a non-movant fails to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268–69 (11th Cir. 2008); *United States v. 5800 S.W. 74th Ave.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

Cross-motions for summary judgment do not affect the applicable Rule 56 standard. *See, e.g., Am. Bankers*, 408 F.3d at 1331; *Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233–34 (11th Cir. 2001).  "'Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . .'" *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).  "'When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed. Cir. 2001)).[3]

---

[3] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

**B.     Deliberate Indifference**

The Eighth Amendment prohibits the infliction of cruel and unusual punishments. U.S. CONST. amend. VIII.  Because inmates are deprived of liberty and the ability to provide for themselves, the Eighth Amendment imposes an affirmative duty upon the state to ensure prisoners are "furnished with the basic human needs, one of which is 'reasonable safety'" from themselves and others. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)); *see Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) ("The Eighth Amendment 'imposes a duty on prison officials' to 'take reasonable measures to guarantee the safety of the inmates.'" (alterations adopted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994))); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) ("[I]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions . . . .").  An obvious danger against which prison officials must guarantee safety by reasonable measures is attack by other incarcerated individuals. *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 767 (11th Cir. 2016) ("[I]t has long been recognized that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners.'" (quoting *Farmer*, 511 U.S. at 833)).

"In the case of a pre-trial detainee[,] . . . 'the Eighth Amendment prohibitions against cruel and unusual punishment do not apply.'" *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir. 1994)).  "[U]nder the Supreme Court's current framework, . . . the Eighth Amendment covers prisoners, and the Fourteenth Amendment

covers . . . pretrial detainees." *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021) (quotation marks omitted) (quoting *Piazza v. Jefferson County*, 923 F.3d 947, 952 (11th Cir. 2019)). Nonetheless, "'the minimum standard allowed by the [Fourteenth Amendment's] due process clause is the same as that allowed by the [E]ighth [A]mendment for convicted persons.'" *Cook*, 402 F.3d at 1115 (quoting *Belcher*, 30 F.3d at 1396). Thus, Fourteenth Amendment deliberate indifference claims brought by pretrial detainees are analyzed under the same law as Eighth Amendment deliberate indifference claims brought by convicted prisoners. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Cook*, 402 F.3d at 1115).

To succeed on a claim of deliberate indifference, a plaintiff must satisfy a two-part test:

> 1. *First* . . . the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat . . . that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk."

*Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (internal citations omitted) (quoting *Farmer*, 511 U.S. at 834, 839, 844–45). A plaintiff must also produce sufficient evidence of "causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (citing *Goebert*, 510 F.3d

6

at 1326).  Accordingly, the plaintiff must satisfy (1) the objective inquiry, (2) the subjective inquiry, and (3) causation.

To satisfy the objective inquiry, a plaintiff must show a condition "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).  To satisfy the subjective inquiry, a plaintiff must show that the defendant: "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (citing *Farmer*, 511 U.S. at 836–40).  To demonstrate subjective knowledge of a risk of serious harm, it is not enough to show that a defendant "*should have known*" of a substantial risk of serious harm—it must be shown the defendant "*actually knew* of a substantial risk of serious harm." *See Wade*, 106 F.4th at 1257 (emphases in original).  Further, subjective recklessness is demonstrated "only if the plaintiff shows 'that the defendant actually knew that his conduct—*his own acts or omissions*—put the plaintiff at substantial risk of serious harm.'" *Stalley*, 124 F.4th at 1283 (emphasis added) (quoting *Wade*, 106 F.4th at 1253).  Even so, "a defendant who 'responds reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 844)).

## C.    Government Entity Liability

"A local government"—including a county—"can be directly responsible for [deliberate indifference] due to its acts or omissions." *Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469

(1986); *Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981)), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63 (2007).[4]  But a local government "will be liable . . . only for acts [or omissions] for which [it] is actually responsible." *Marsh*, 268 F.3d at 1027 (citation omitted).  For that reason, "[s]ection 1983 will not support a claim based on a *respondeat superior* theory of liability." *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (emphasis in original) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. 658, 694.  Municipal, or county, liability imposes a "very high" bar. *Simmons v. Bradshaw*, 879 F.3d 1157, 1169 (11th Cir. 2018).

A county may be liable "for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur*, 475 U.S. at 480; *cf. Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) ("[A] single constitutional violation may

---

[4] Valenza appears to suggest that *Marsh v. Butler County* was meaningfully abrogated. (*See* doc. 71 at 9 n.2).  But *Marsh* was only abrogated by *Twombly* insofar as *Marsh* cited the old "no set of facts" pleading standard—indeed, the case Valenza cites to note *Marsh*'s abrogation makes this point. *See Aguirre v. Seminole County*, 158 F.4th 1276, 1298 (11th Cir. 2025).

Similarly, Valenza suggests that *Marsh* is inapposite because it concerned a "claim that the defendant-sheriff failed to respond reasonably to his serious medical needs by instituting a 'policy of releasing sick or injured inmates.'" (Doc. 71 at 9 n.2 (quoting *Marsh*, 268 F.3d at 1035)).  But *Marsh* also addressed prison conditions claims involving "the risk of inmate-on-inmate attacks." *See Marsh*, 268 at 1028–34.  So Valenza's arguments that *Marsh* has been substantively abrogated and is otherwise inapposite are unavailing.

result in municipal liability when there is sufficient independent proof that the moving force of the violation was a municipal policy or custom." (quotation omitted)); *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 n.10 (11th Cir. 1985) (en banc) ("'A § 1983 cause of action is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims.'" (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985) (Brennan, J., concurring))), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989). Accordingly, to establish liability for deliberate indifference against a county, a plaintiff "must show '(1) that [his] constitutional rights were violated; (2) that [the county] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'" *Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

**D.    Qualified Immunity**

Qualified immunity protects government officials from suit when they perform "discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where a defendant asserts qualified immunity, "the public official [must] first show[] that []he was acting within the scope of h[is] discretionary authority." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). If the public official makes that showing, the burden then falls on the plaintiff "to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.

9

2002). To do so, a plaintiff must show a violation of clearly established rights. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc). Courts are instructed "not [to] define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

"'[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.'" *Bailey v. Swindell*, 89 F.4th 1324, 1329 (11th Cir. 2024) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002)).

### III.  FACTS[5]

**A.    Background**

Since August 18, 2014, Valenza has been Sheriff of Houston County. (Doc. 56-1 at 11:8–11). He is responsible for managing and policing the Jail, which includes establishing and enforcing its protocols and policies. (*See id.* at 11:15–17, 12:2–5; doc. 56-7 at 12:15–

---

[5] As to each motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant, and draws all justifiable inferences in the nonmovant's favor. *See Anderson*, 477 U.S. at 255; *Chavez*, 701 F.3d at 899.

16, 12:23–13:1; *see also* doc. 52-4 at 6, paras. 8–9). Valenza also testified that his duties include protecting both the correctional officers and detainees. (*See* doc. 56-1 at 42:13–15 ("We try to protect the inmates and the corrections officers. Our job is to protect them, keep them healthy, and get them to trial.")).

While Valenza runs the Jail's day-to-day operations, the Commission is responsible for its "maintenance and repairs." (Doc. 56-3 at 29:9–21; doc. 52-4 at 6, para. 7). The Commission comprises four members (the "Commissioners") and a chairman (the "Chairman"), who only votes if the Commissioners are deadlocked. (Doc. 64-1 at 6–7, paras. 21, 24). The Chairman sets the agenda for each administrative meeting and drafts the annual county budget, including the Jail's funding. (*Id.* at 5–6, paras. 20–21). Nevertheless, a majority of the Commissioners at an administrative meeting may add any item to the agenda for official meetings. (*Id.* at 7, para. 25). Moreover, the Commission's policy allows it to add "[i]tems of an emergency nature . . . at any commissioner's request after an attempt to notify commissioners and there is a unanimous consent to add the item to the agenda." (Doc. 64-15 at 1).

The Jail has two segregation dormitories for inmates on disciplinary lockdown, "I" and "J." (Doc. 62-1 at 2, para. 7). If an inmate is considered a continuing "assault risk" to others after his time in disciplinary lockdown, he is placed in "M" dormitory. (*See* doc. 56-9 at 24:20–23, 32:1–19). For an inmate to end up in one of these dormitories, he would have to "violate[] one of the major jail rules, including assault on another inmate, disrespect towards an officer, [or] hoarding medication." (Doc. 62-1 at 2, para. 8). In these

dormitories, detainees are allowed one hour a day outside their cell—a period the Jail staff refer to as "rollout." (*See* doc. 62-2 at 190:19–91:21).

Monitoring each of the dormitories is a deputy in a control booth. (Doc. 56-7 at 55:21–56:20). In the booth, there is a monitor that is intended to show which cell doors are locked. (*Id.* at 56:2–8). However, the indicators have the potential to malfunction because doors could incorrectly appear locked. (*Id.* at 56:9–17). David Asbill ("Asbill"), the Jail Commander under Valenza, testified that it is common knowledge that prisoners routinely attempt to manipulate locks. (*Id.* at 69:13–16; *see id.* at 69:17–19 ("Q: And that's an issue that happens [at] every jail in the country; correct? A: Yes, sir.")). This practice is commonly referred to as lock "popping." (*See id.* at 69:20–22).

James Brazier ("Brazier"), the former Jail Commander and Administrator, recalled that "inmates [were] able to start popping out of the[ir] cells" around his start at the Jail in 2009.[6] (Doc. 56-2 at 17:15–18:10). Indeed, he recalled that inmates did so "constantly." (*Id.* at 32:2). Checking locks was ineffective, as "[e]ven if [they] tried to lock people down, [the inmates] could still get out." (*Id.* at 23:18–23).

During his tenure, Brazier only remembered "maybe one" lock being rebuilt. (*Id.* at 30:17–20). He opined that the inmates' ability to pop the locks created a dangerous condition at the Jail for detainees and staff and was "a source of major concern for the [J]ail employees." (*Id.* at 31:1–17, 35:22–36:2). During his tenure, he recalled that detainees who popped the locks "periodically" attacked other detainees. (*Id.* at 35:11–17). Brazier

---

[6] Sergeant Tony Murphy ("Murphy") recalled the issue with the locks beginning around 2020. (Doc. 56-9 at 16:7–16). In any event, this issue was old news when Hobson was attacked in 2024.

retired in April 2023, in part "because the[ Commission] would not fix the locks." (Doc. 56-2 at 41:13–18, 43:5–11).

The Jail could not afford to replace the locks without funding from the Commission. (*See* doc. 56-3 at 23:12–24:4, 49:4–11).    Major Bill Rafferty ("Rafferty") testified regarding the Jail's finances. (*See generally id.*).    He explained that some of the Jail's funding comes from accounts operated by the Sheriff, which includes funds from the sale of pistol permits and money spent by prisoners at the commissary. (*Id.* at 17:20–18:7).    But the lion's share—"[ninety]-plus percent"—comes from funding approved by the Commission. (*Id.* at 23:21–24:4).    Because Rafferty is largely responsible for developing the Jail's budget, he is intimately familiar with the Jail's requests to the Commission for funding. (*See id.* at 11:14–12:18, 26:10–20).

Rafferty was uncertain when he first requested funding to replace the locks at the Jail; he stated that he began attempting to address the issue in 2014 but did not know about the locks specifically prior to 2021.[7] (*See id.* at 32:12–33:2, 33:20–36:9, 39:12–17).    He clarified that the locks "became a more frequent part of [the Jail's] issues in the last several years compared to 2014." (*Id.* at 43:20–22).    He stated that even when "deputies were going back in [the dormitories] and being sure . . . the door was shut and locked . . . inmates [were] still getting out." (*Id.* at 35:6–9).    Rafferty recalled that as a result, in 2022 or 2023, "one of [the] corrections deputies . . . was beat down and it took several minutes" to rescue

---

[7] Looking to the record, it is not clear when the Jail first made a formal request to the Commission regarding the locks.    In the special budget requests for fiscal years 2021–22 and 2023–24, locks do not appear as a line item. (*See* docs. 56-12 & 56-13).

13

him.[8] (*Id.* at 44:9–45:20).  Rafferty also stated that for two or three years prior to submitting a formal request to the Commission, the maintenance department was attempting to rebuild locks. (*Id.* at 41:11–23).  He asserted that "inmates getting out of the cell is definitely a concern.  Safety for the inmates, . . . staff, . . . correction deputies. . . . We bring it to the attention of the [Commission]." (*Id.* at 44:21–45:3).  Brendon Shoupe, who became the Chairman in November 2022 ("Shoupe" or "Chairman Shoupe"),[9] stated that the Commission has "[n]ever turned a blind-eye towards any funding request made by the Sheriff." (Doc. 64-1 at 6, para. 23).

Valenza was first made aware on January 7, 2021, of the need to repair a lock on a cell door that would not work.[10] (Doc. 52-5 at 7, para. 13).  The cell door locks throughout the Jail were ineffective such that "[t]here was no way for staff to track which locks might be subject to jimmying." (Doc. 62-1 at 4, para. 16; *see* doc. 56-7 at 26:6–15 (Asbill stating, "[i]n the housing units themselves it's just a general assumption that half of them worked and half of them didn't"); doc. 56-3 at 73:3–74:12 (Rafferty explaining lights that were intended to indicate whether cell doors would lock were not working properly); doc. 56-9 at 17:22–18:17, 34:8–11, 35:7–15).  As a result, on at least thirty-five occasions prior to Hobson's assault, prisoners unlocked their cell doors.[11] (Doc. 52-5 at 7–8, para. 14).  And

---

[8] Rafferty stated that he showed a video of this incident to the commissioners. (Doc. 56-3 at 45:2–21).

[9] Shoupe had also served as a commissioner since 2014. (Doc. 64-1 at 1, para. 2).

[10] The record is unclear regarding where this nonfunctioning lock was located.

[11] Rafferty testified that the maintenance records, which tracked requests to fix specific locks, only go back to January 2021 because of software issues. (Doc. 56-3 at 31:16–22).

"all staff employed at the . . . Jail . . . were aware of the potential for inmates to 'jimmy' locks to unlock themselves." (*Id.* at 9, para. 16).  Valenza recalled that as a result, at least two corrections officers who came from other facilities "quit and said, 'this is not a safe place to work.'" (*See* doc. 56-1 at 65:13–23; *see also* doc. 56-9 at 17:9–14 (Murphy recalling conversations between Sheriff's deputies about "how unsafe it is for inmates [to be] able to manipulate the locks."")).  Valenza further noted that as of January 2022, the locks "were probably worn out" after twenty years and "ha[d] been tampered with" to such an extent that "the inmates figured out how to beat" them. (Doc. 56-1 at 44:15–45:5).

Prior to February 14, 2024, Valenza was personally "aware that prisoners at . . . [the] Jail were able to unlock their own cell doors." (Doc. 52-4 at 6, para. 11).  He likewise admitted that he was "aware of the safety risk created by prisoners at . . . [the] Jail being able to unlock their own cell doors," but nevertheless denied awareness that this "subjected [Hobson] to an unreasonabl[y] dangerous hazard that exposed him [to] serious personal injury." (*Id.* at 6, paras. 12–13).  At the same time, he considered the ineffective locks "a serious concern" "[b]ecause [he] [has] jailers that get assaulted," and it was his "job to protect them" along with the "other inmates." (Doc. 56-1 at 54:18–55:5).  He likewise acknowledged that the situation posed a substantial hazard to staff and inmates, and that he believed there was a "strong likelihood that someone would get seriously injured," "whether it[ was] one of [his] jailers or another inmate." (*Id.* at 55:14–20).

> Q:    [I]f you have a population that comprises Houston County Jail and their access is not restricted, that—would you agree that's a recipe for disaster?
>
> . . . .

> A:    Yeah.  Anytime you have the—the cell doors are there for a reason, and it's to keep control of our facility.  And when they're breaching these locks, that's not . . . very safe being in there, no.

(*Id.* at 55:21–56:7).

And Valenza acknowledged five separate occasions between June 3, 2023, and February 4, 2024, where detainees had opened their locked cells and assaulted others.[12]

> On June 3, 2023, where inmate Henderson Miller, Jr. manipulated his cell door to open it then began to assault inmate Tommy Jones and inmate James Tanner manipulated his cell door to open it and began fighting inmate Tommy Jones as well (no medical treatment was needed);

> On June 27, 2023, where inmate Deh'Juan Sanders manipulated his cell door to open it and assault inmate Dmitri Wright (no medical treatment needed);

> On July 15, 2023, where inmate Dmitri Wright manipulated his cell door to open it, opening inmate Samuel Wilson's cell door, then became aggressive with jail staff who were attempting to discipline him (only medical treatment required was for decontamination following issuance of [pepper] spray) (4 officers involved);

> On December 19, 2023, where inmate Dmitri Wright manipulated his cell door to open it and became aggressive with jail staff who were attempting to discipline him (only medical treatment required was for decontamination following issuance of [pepper] spray) (1 officer involved); and

> On February 4, 2024, where inmate Henderson Miller, Jr. manipulated his cell door to open it then became aggressive with jail staff (only medical treatment required was for decontamination following issuance of [pepper] spray) (5 officers involved).

---

[12] Asbill stated that as a general matter at the Jail, assaults between detainees "come[] and go[] in spurts" of varying severity. (Doc. 56-7 at 33:8–18).

16

(Doc. 52-5 at 9–10, para. 17).

Before his retirement, Brazier informed Captain James Ivey of the Commission about the issues with the locks. (*See* doc. 56-2 at 21:15–22 ("[I] kept telling him 'We need to get these locks fixed . . . as soon as you can' because, . . . things are going to start failing.")). Valenza admitted that prior to February 14, 2024, he informed the Commission that the locks in the Jail "were not functioning properly and need[ed] to be replaced and/or repaired." (Doc. 52-4 at 5, para. 4). He testified that he had "requested [the Commission] to have the[] locks changed" for two years prior to the assault on Hobson. (Doc. 56-1 at 63:3–20). He also notified the Commission, prior to February 14, 2024, that the ineffective locks in the Jail "created an unreasonably dangerous situation for the inmates and staff of the . . . Jail." (Doc. 52-4 at 5, para. 5). He specifically communicated the situation to Shoupe and two Sheriff's deputies who were on the Commission, (*see* doc. 56-1 at 64:7–16), and stated that Rafferty showed Shoupe the videos of detainees popping their locks, (*see* doc. 56-1 at 65:5–8). As a result, Valenza opined that the Commission "knew it was a serious situation." (*Id.* at 65:13–23; *see* doc. 52-4 at 5–6, para. 6 (Valenza asserting that prior to February 14, 2024, the Commission "was aware the defective locks created an unreasonably dangerous hazard for the inmates and staff of the . . . Jail"). He likewise indicated that the Commission's decision not the fund the replacement was made despite awareness of the condition of the locks and the specific danger they created. (*See id.* at 65:24–66:6 ("Q: So that decision was not based on the lack of not appreciating the hazard? . . . . A: This is a serious issue we addressed during this time. Q: And that was

17

communicated[?]  A: That was communicated—yes, that was passed on and [we] showed videos.")).

Rafferty stated that the budgetary process begins with the Chairman and the chief financial officer of Houston County, Peter Covert ("Covert"). (Doc. 56-3 at 13:17–14:17). Rafferty testified that the Sheriff's Office had addressed the issues with the locks by notifying the Commission: "[W]e've been trying to get it fixed. [We] . . . went to the [C]ommission, the [C]hairman, the chief financial officer . . . and it had been being addressed with the boards over a period of time." (*See* doc. 56-3 at 48:17–49:15; *see also id.* at 49:12–50:11 (Rafferty's testimony that he communicated the urgency of the issue to the Commission, that it was "a major concern . . . [for] the safety of [the] inmates," and that "[p]otentially somebody could get hurt badly"); *accord id.* at 55:18–57:5).

Shoupe acknowledged that on July 25, 2023, Rafferty sent two emails to the Commissioners and Covert. (Doc. 64-1 at 3, para. 9).  The first, forwarded from Asbill, noted that an inmate or inmates had popped the locks on their doors "at night after roll in," placing the patrolling deputy "at risk." (Doc. 64-2 at 1).  Rafferty added that "[i]t is believed d[ue] to no inmates being out of the cells during this time[,] the inmates were setting up and waiting for a Corrections Deputy to enter the pod and attack." (*Id.*).  The second included a video of "inmates . . . popp[ing] the cell door locks and attack[ing] other inmates." (Doc. 64-3 at 1).  Rafferty also testified that he was eventually "banned" from unmediated communication with the Commission and began to have to obtain permission from the Chairman to share "concerns about [the] corrections deputies being in danger." (*See* doc. 56-3 at 45:2–18).  Rafferty opined that Chairman Shoupe did not act because

"[h]e's a politician, and he cares about a vote and not where the money needs to go." (*Id.* at 57:17–23). He likewise opined that the Commission was concerned with Houston County's "bottom line as opposed to anything else." (*See id.* at 62:5–15).

At some point, Valenza realized that the Commission was not going to provide money for the locks. (Doc. 56-1 at 72:20–22). Valenza indicated that despite that realization, he did not direct anyone to investigate any interim measures to address the lock issues. (*Id.* at 72:23–73:18). Indeed, he stated that the Jail did "not have a specific, formal procedure" to implement "after being notified that a prisoner is able to unlock his own cell door." (Doc. 52-5 at 11, para. 22). Existing measures at the time included removing inmates from cells where a "lock [wa]s physically broken and c[ould]n't be secured" and disciplining inmates who unlocked their cells. (*Id.*). Jail staff would report broken locks to the Houston County Maintenance Department ("Maintenance"), which was run by the Commission. (Doc. 56-3 at 41:11–23; doc. 56-2 at 24:11–14).

Maintenance had been managed by Tommy Dixon ("Dixon") since April 2023. (Doc. 64-16 at 1, para. 2). Dixon's "recollection [was] that this was not a widespread problem with a large number of inmates. Instead, just a few inmates were the ones manipulating the locks." (*Id.* at 2, para. 5). On July 10, 2023, Covert requested Dixon perform a walkthrough of the Jail with a private contractor, Willo Products, to "give an estimate to update and repair the locking system." (*Id.* at 2, para. 6). After the walkthrough, on January 14, 2023, Willo Products proposed a system similar to that already used at the Jail, and Chairman Shoupe was "concerned the Commission might spend roughly a million

19

dollars . . . but still have the same problem."[13] (*Id.* at 3, paras. 7–8).  Chairman Shoupe directed Dixon to "replac[e] some of the locks . . . to see if that would fix the problem." (*Id.* at 3, para. 8).  Because most of the problems with locks occurred in A and M dormitories, Maintenance's plan was to replace or rebuild the locks in those two dormitories. (*Id.* at 4, paras. 10–13).

On December 20, 2023, Houston County, through administrative assistant Samantha Butler ("Butler"), submitted an order to RR Brink Locking Systems for replacement of the locks in M dormitory. (Doc. 64-5 at 1).  After no response, Butler followed up on January 8, 2024, (*see id.*), and received information that RR Brink Locking Systems had been acquired by Southern Folger Detention Equipment Company and thus any further orders would have to be placed through that firm, (*see* doc. 64-6 at 1).  A representative of Southern Folger Detention Equipment Company followed up shortly thereafter, requesting that Houston County complete a customer information form for an account. (*See* doc. 64-7).  On January 30, 2024, another representative emailed Houston County requesting contact information. (Doc. 64-8).

For the Jail's part, Assistant Commander Kelita Moore ("Moore") instructed staff to pay special attention to the issue with the locks in M dormitory on October 5, 2022:

> When rolling out a cell in M-pod you are to go into the pod and roll the inmate out. . . .  After rolling the inmate out you are to check the locking mechanism to make sure nothing is in it and secure the door. . . . During your cell searches you need to look for any strings or torn items and confiscate them. We have

---

[13] In the four or five months after Willo Products' walkthrough, Asbill communicated with three other companies about replacing the locks, though none of those inquiries panned out. (*See* doc. 56-7 at 66:8–67:18–69:12).

had too many problems with inmates tricking the doors and coming out of their cells. This is a safety risk for not only other inmates but also you all. To ensure this procedure is followed by all deputies it will be closely monitored.

I want to address another problem. Anytime you feel like you need assistance in a pod do not hesitate to call for assistance or contact your supervisors for them to come and give you assistance. In some instances you can back away from the situation until you can get assistance on the floor. Never feel bad for wanting or needing assistance no matter how small the situation may appear to others. You all have got to be eachothers back up [sic] and work together. Deputies in the booths please keep your eyes on the Deputies in the pods. Please be safe and use good judgement when dealing with these inmates.

(Doc. 56-11).  And on May 31, 2023:

When rolling inmates out in M-pod, you are physically to go into M-pod and roll the inmate out and secure the door. When rolling an inmate in you also need to physically go in and secure the door. While doing this you are to check the lock to make sure there is no paper or anything else in the locking mechanism. If you need assistance rolling in or rolling out an inmate you are to contact your supervisor. . . .  No inmates are to pass anything under any cell doors. It is important that you all follow these directions for the safety of your coworkers and the inmates. Supervisors follow up with your deputies and monitor M-pod to ensure this is being done.

(Doc. 56-10).  Moore stated that it was the general practice throughout the entire Jail to

"inspect[] cell doors for obstructions[] and confirm[] that each cell door was secure after

closure." (Doc. 62-1 at 5, para. 25).  Again, however, even if there were no obstructions,

"[t]here was no way for staff to track which locks might be subject to jimmying." (*Id.* at 4,

para. 16).

**B.     The Incident**

Hobson was arrested on February 9, 2024, and held at the Jail as a pretrial detainee. (*See* doc. 62-2 at 177:20–23).  On February 12, 2024, an officer at the Jail gave Hobson's lunch tray to another detainee, Tyshawn Bryant ("Bryant"). (*Id.* at 184:2–9).  Hobson demanded the tray, prompting Bryant to spit in the food. (*Id.* at 184:10–18).  Hobson hit Bryant and was placed in disciplinary lockdown in J dormitory. (*Id.* at 184:19–186:17).

On February 14, 2024, while still on disciplinary lockdown, Hobson left his cell during his allotted hour rollout. (Doc. 62-2 at 191:5–14; doc. 56-4 at 1).  Another detainee, Vazarius James ("James"), called him over to his cell to talk. (Doc. 62-2 at 193:22–195:14). Hobson went over to James's cell and squatted to talk to him through the hole used for inserting food into detainees' cells. (*Id.*)  Then a second detainee, James Tanner ("Tanner"), popped his cell door's lock and attacked Hobson from behind. (*See id.* at 92:20–23, 101:15–17, 109:15–22).  James then exited his own cell and began to attack Hobson. (*See id.* at 109:15–22, 192:16–193:1; doc. 56-4 at 1).[14]

From the control booth, Sergeant Morris ("Morris") noted that two cell doors in J dormitory were "showing open." (Doc. 56-4 at 1).  Morris asked Corporal Kennedy ("Kennedy") to check on the doors. (*Id.* at 2).  Kennedy went to J dormitory, where she recalled seeing "Tanner and James in the dayroom wrestling with Hobson . . . . James was

---

[14] Neither Tanner's nor James' J dormitory cell doors had a documented history of maintenance issues. (*See* doc. 56-5; doc. 56-6; doc. 62-1 at 3, para. 13).  Valenza testified that Tanner had a history of opening locks and attacking other inmates. (*See* doc. 56-1 at 78:1–17; *see also* 56-9 at 23:3–20 (Murphy stating that Tanner previously manipulated the lock of his cell, then similarly manipulated the lock of another cell to attack an inmate therein)).  Notably, Tanner's previous assaults were not among the five cited by Valenza in his interrogatory response. (*See* doc. 52-5 at 9–10, para. 17); *see also* discussion *supra* page 16.

kicking Hobson. . . . Tanner picked up Hobson and threw him to the ground on the cement floor head fist. When [she] approached Hobson, his face was full of blood." (*Id.* at 1). Hobson was diagnosed with "multiple open fractures" to his facial bones. (*See* doc. 62-2 at 131:12–18).

## C.   Aftermath[15]

According to Hobson, after he returned to the Jail, Moore and other staff encouraged him to sue the Commission. (*See* doc. 62-2 at 120:13–20, 202:13–204:13). He testified that Moore said she "would sue, because they know that them lock mechanisms [were] supposed to [have] been fixed a long time ago." (*Id.* at 120:13–19). He also claimed that a "Mr. Roberts," who worked at the commissary, told him, "if I was you, I wouldn't let them get away with it," and likewise suggested he should sue. (*Id.* at 202:11–203:14). For his part, Valenza opined that "if the locks were properly working" on February 14, 2024, Hobson would not have been injured. (Doc. 56-1 at 71:8–13). Valenza also told a news outlet that he had been requesting new locks for the Jail for years. (*See* doc. 56-20 at 1).

After learning of the attack on Hobson, Chairman Shoupe directed Butler to cancel the order for the locks from Southern Folger Detention Equipment Company. (Doc. 64-1 at 3, para. 13). On March 14, 2024, the Commission, through Chairman Shoupe, solicited bids for contractors to replace all the locks in the Jail. (*See id.* at 3–4, paras. 14–15; doc. 64-10 at 1, 11–17). On May 28, 2024, the Commission awarded the lock project to

---

[15] Evidence of the Commission's subsequent remedial measures is "not admissible to prove . . . culpable conduct." FED. R. EVID. 407. The Court does not consider these measures for that purpose; instead, the Court recounts them here only to provide context for the statements of Valenza and Chairman Shoupe in the wake of the purchasing of new locks. At trial, however, such measures are otherwise admissible for impeachment, "or—if disputed—proving . . . the feasibility of precautionary measures." *Id.*

23

Montgomery Technology Systems. (Doc. 64-1 at 4–5, paras. 17–18; doc. 64-12 at 3–4). Installation of new locks was completed in July 2025. (Doc. 56-7 at 56:23–57:8).

On May 23, 2024, after the Commission received a grant to partially cover the cost of the new locks, Chairman Shoupe publicly stated that "the [J]ail is not something that any elected official wants to spend money on" and that he would rather have put the money "into asphalt quite honestly." (Doc. 56-20 at 1).  At the same time, he also reported that the Commission had "serious ongoing safety concerns, not only for our inmates but for our jailers that work in the [J]ail, so we have to do something," explicitly acknowledging "[w]e've known about this for a long time." (Doc. 52-7).

## IV.  ANALYSIS

At the outset, the Court notes that Hobson purports to accept the undisputed facts as set forth by the opposing party. (Doc. 68 at 2 ("Plaintiff admits the numbered factual statements set forth by [Valenza] for purposes of summary judgment only.")).  However, Hobson also argues that he is entitled to summary judgment as to his claims against Valenza and the Commission. (*Id.* at 2 ("Th[e undisputed] facts, however, support Plaintiff's claims . . . .")).  Valenza and the Commission do the same. (*See* docs. 55 & 67). Accordingly, the Court simply views "the facts . . . in the light most favorable to the non-moving party on each motion," as it must when presented with cross-motions for summary judgment. *Chavez*, 701 F.3d at 899.  Similarly, with regard to qualified immunity, the Court views the evidence in the light most favorable to Hobson. *See Johnson*, 280 F.3d at 1317.

For the reasons articulated below, the Court determines that Valenza's motion for summary judgment is due to be granted, and that Hobson's and the Commission's motions

are due to be denied. This reflects the result of several determinations made by the Court in resolving the pending motions. With respect to Valenza, Hobson has not shown that the constitutional violation he alleges was clearly established. But with respect to the Commission, Hobson has adduced sufficient evidence for a reasonable jury to find that the Commission's decision not to replace the locks was tantamount to a policy decision that constituted deliberate indifference. At the same time, there is record evidence that would permit a reasonable jury to find in the Commission's favor. Accordingly, summary judgment will be granted as to Hobson's claim against Valenza, but his claim against the Commission will go to a jury.

## A.    Sheriff Valenza

Valenza does not dispute that Hobson's injuries, as alleged, resulted from Valenza's performance of discretionary acts under color of state law. Given Valenza's description of his role, and the duties vested in him by Alabama law, *see* ALA. CODE § 14-6-1 (entrusting sheriffs with "legal custody and charge of the jail in his or her county and all prisoners committed thereto"), the Court agrees that Valenza's decisions regarding the cell door security issues fell squarely within his discretionary authority. *See Cagle v. Sutherland*, 334 F.3d 980, 989 & n.12 (11th Cir. 2003). Accordingly, the only question is whether the evidence establishes a constitutional violation that was clearly established.

### 1.    *Deliberate Indifference*

At this stage, viewing the evidence in the light most favorable to Hobson, a reasonable jury could conclude that Valenza was deliberately indifferent. First, Hobson suffered a deprivation that was, "objectively, 'sufficiently serious'" by his "incarcerat[ion]

25

under conditions posing a substantial risk of serious harm." *Wade*, 106 F.4th at 1262; *Farmer*, 511 U.S. at 834.

There is conflict in the record as to the extent and seriousness of the issues with the locks. For instance, Brazier stated detainees were able to begin escaping their cells as early as 2009. Rafferty stated that the problem was comparatively more significant than it had been in 2014, and that the Commission began rebuilding some of the locks two to three years prior to his making any formal requests for funding. Valenza testified that the issues began in 2021. Meanwhile, though some testimony suggests the issues affected about half of the locks, other testimony supports the inference that *all* the locks were manipulable. What is undisputed, however, is that an unknown number of cells throughout the Jail were defective such that it was unpredictable which could be opened, even in cell blocks designated to house those with disciplinary infractions—including for popping locks. On at least five occasions prior to Hobson's assault,[16] inmates had popped locks and assaulted others. As these prior occasions had shown, it could take several minutes for staff to respond to an assault or to discover that a detainee had escaped their cell. A reasonable jury could find that Hobson's assault was a direct result of his being incarcerated in this environment.

The testimony of numerous members of the Jail staff supports a reasonable inference that these conditions were objectively, sufficiently serious. The testimony from

---

[16] There is evidence in the record of specific, additional assaults that occurred which do not appear to have been documented by the Jail. (*See, e.g.*, doc. 56-1 at 78:1–17 (discussing prior assaults by Tanner); doc. 56-9 at 23:3–20 (same); doc. 56-3 at 44:9–45:20 (discussing an incident where an inmate attacked an officer and it took several minutes to rescue him)).

individuals who worked at the Jail suggests that the conditions were dangerous for both inmates and staff—indeed, Brazier testified that multiple staff members quit because they felt unsafe.   When Rafferty sent videos to the Commission, he specifically noted that even where detainees were not out of their cells, they might be lying in wait to attack any guard that passed—implying that, as far as they knew, any detainee could exit their cell at any time, and that the detainees had a potential for violence.  Moreover, reasonable jurors could infer from Brazier's and Rafferty's testimony that this issue predates the extant maintenance records.  A reasonable jury could therefore conclude that due to the condition of the locks, "a generalized, substantial risk of serious harm from inmate violence" existed at the Jail, including J dormitory—where, again, inmates with disciplinary infractions, including for popping locks, were held. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995); *see also Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.").

Nevertheless, reasonable jurors could also believe Dixon's testimony indicating that the issue was not widespread and that the documented assaults in 2023 and 2024 represented the full extent of the harms resulting from the locks.  Accordingly, there are genuine disputes of material fact that preclude summary judgment in either direction on the objective prong.

Second, a reasonable jury crediting Hobson's version of events could conclude that Valenza was subjectively aware that his own conduct caused a substantial risk of serious

27

harm to Hobson. *See Wade*, 106 F.4th at 1262.   Hobson has presented evidence that Valenza was aware of the risk.  Valenza acknowledged he was personally made aware of the need to repair a lock on a cell door on January 7, 2021.  He also recalled officers quitting due to the safety hazard created by the locks.  In fact, Valenza acknowledged that the situation posed a substantial hazard to staff and inmates, and that he felt like there was a strong likelihood that someone would get seriously injured. (*See* doc. 56-1 at 55:5–13 ("Q: [I]f the inmates in the [J]ail can get out of their cell, does that pose a substantial hazard to staff and inmates? A:  Absolutely.").  He stated that the situation was a "recipe for disaster," (*id.* at 55:21–56:7), and conceded that he was aware of the safety risk created by detainees being able to open their own cells and was aware of the specific kind of harm posed, (*id.* at 54:18–55:5 (Valenza's testimony that the lockers were "a serious concern" for him because he had "jailers that g[o]t assaulted" and it was his duty to "protect [the detainees]")).  He also admitted that prior to February 14, 2024, the Commission "was aware the defective locks created an unreasonably dangerous hazard for the inmates and staff of the . . . Jail," which suggests that he also knew that "the defective locks created an unreasonably dangerous hazard" for the detainees. (Doc. 52-4 at 5–6, para. 6).  And, if a jury were to find that the issue had existed from the beginning of Valenza's tenure, it would support a finding of the requisite intent. *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent . . . ." (emphasis omitted) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)); *Marsh*, 268 F.3d at 1030 (indicating that "longstanding and pervasive" conditions supported a showing of subjective awareness).

28

To be sure, Valenza has denied that he was aware that the defective locks "subjected [Hobson] to an unreasonabl[y] dangerous hazard that exposed him [to] serious personal injury."[17] (*Id.* at 6, paras. 12–13). But at summary judgment, it is not the Court's role to weigh the evidence or conclusively draw inferences. *Anderson*, 477 U.S. at 255. If jurors were to believe Valenza's version of events, they might reasonably conclude that Valenza lacked the requisite subjective awareness. Yet, for the purposes of the summary judgment analysis, reasonable jurors viewing all the evidence and crediting Hobson's version could conclude that Valenza was subjectively aware that his own conduct created a substantial risk of serious harm. But because the outcome on this element depends on a jury's finding, summary judgment in favor of Hobson is, again, not appropriate.

Finally, looking at the record at this stage in the light most favorable to Hobson, a reasonable jury could conclude that Valenza failed to respond reasonably. Valenza realized that the Commission was not going to provide money for the locks prior to Hobson's injury. (Doc. 56-1 at 72:20–7:22). Despite that realization, Valenza testified that he did not direct *anyone* to investigate *any* interim measures to address the lock issues.

> Q:    At some point in time you realize you're not getting the money. Is that fair?
>
> A:    Yes.
>
> Q:    Okay. What else do you think you could have . . . done—understanding that you don't get the money to fix the locks, is there—did you investigate and, okay, is there something else we could do to try to reduce the hazard?

---

[17] To the extent Valenza's admission, harmonized with his other admissions, implies that he was subjectively aware of a general danger to all inmates but not Hobson particularly, such inference is insufficient by itself to defeat the subjective prong. *See Farmer*, 511 U.S. at 842 (stating that knowledge that harm would befall a specific inmate is not required for deliberate indifference).

29

. . . .

> A:    Mine is to fix the locks. That's a safety issue. They needed to be fixed, not denied.
>
> Q:    Did you do any type of investigation, did you have anybody to investigate, okay, we're not getting the money, is there some other way we can—that doesn't cost as much or something we could do to mitigate this hazard?
>
> . . . .
>
> A:    Before the incident, no.

(*Id.* at 72:23–73:18).  Instead, Valenza continued to rely on existing measures under which the issue persisted, like removing inmates from cells where a lock was broken beyond repair, disciplining detainees who exploited the locks, and reporting the cells with issues to Maintenance. (Doc. 56-3 at 41:11–23; doc. 56-2 at 24:11–14; doc. 52-5 at 11, para. 22). At the same time, he testified that the Jail lacked a "specific, formal procedure" after staff were "notified that a prisoner [wa]s able to unlock his own cell door." (Doc. 52-5 at 11, para. 22).  Nevertheless, Valenza himself recognized "a substantial hazard to staff and inmates" existed even with these interim measures. (*See, e.g.*, doc. 56-1 at 55:5–13).

Valenza's position is similar to that of the sheriff in *Hale v. Tallapoosa County*. There, the sheriff argued that he responded reasonably because "he worked toward construction of a new jail," which he believed "was the only way to reduce the risk of violence." 50 F.3d at 1584. The Eleventh Circuit disagreed:

> While any such efforts by [the sheriff] would appropriately be considered by a jury determining whether [the sheriff] was deliberately indifferent, such efforts would not necessarily absolve him . . . of liability. A jury could find that despite any efforts he made toward construction of the new jail, [the

> sheriff] was deliberately indifferent by disregarding "alternative means" or interim measures for reducing the risk of violence such as those advanced by [the plaintiff]. While consideration of alternatives available to [the sheriff] "comes perilously close to second-guessing the difficult choices that prison officials must face," such consideration "directly addresses the question of whether monetary restraints frustrated [the sheriff's] good faith efforts, or whether he knowingly or recklessly disregarded solutions within his means." We conclude that [the plaintiff] produced sufficient evidence to go to a jury . . . .

*Id.* (internal citations omitted) (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1536, 1538 (11th Cir. 1993)).

So too here. A reasonable jury, resolving the factual disputes in Hobson's favor, could find that Valenza's failure to investigate interim measures under the existing conditions at the Jail (which he knew were not being remedied by the Commission) was not a reasonable response. *See also Farmer*, 511 U.S. at 842 ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." (citations omitted)); *Marsh*, 268 F.3d at 1027 ("[I]t is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates."). Indeed, the Eleventh Circuit has expressly stated that a reasonable response generally includes "taking the time to investigate the threat and *look into different options* all while making sure the prisoners are being supervised." *Mosley v. Zachery*, 966 F.3d 1265, 1268 (11th

31

Cir. 2020) (emphasis added).  Thus, the evidence Hobson proffers is sufficient, if credited by a jury, to establish deliberate indifference.[18]

**2.      *Clearly Established Law***

As stated above, "[a] right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore*, 144 F.4th at 1258.  Whatever method Hobson relies upon, "existing precedent must have placed the . . . constitutional question beyond debate." *See al-Kidd*, 563 U.S. at 741.

Hobson appears to argue there exists a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right. (*See, e.g.*, doc. 53 at 16; doc. 60 at 5; doc. 68 at 3); *Gilmore*, 144 F.4th at 1258.  "[I]t is very difficult to demonstrate" a violation of clearly established law in this way. *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019).  And at bottom, the Court finds that, on this record,

---

[18] Ordinarily, "a plaintiff demonstrates the 'necessary causal link' in this context where he is able to show that the prison official (1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence,' and (3) had 'other means available to him which he nevertheless disregarded.'" *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 622 (11th Cir. 2007) (alterations adopted) (quoting *LaMarca*, 995 F.2d at 1539). Here, however, Valenza acknowledged that if the locks had been working, Hobson's injury would not have occurred and that he failed to investigate any alternative measures to abate the risk despite realizing that funding would not occur.  Under these circumstances, the failure to act altogether or to investigate alternatives clearly satisfies causation. *See Farmer*, 511 U.S. at 842; *Hale*, 50 F.3d at 1584; *Marsh*, 268 F.3d at 1027; *Mosley*, 966 F.3d at 1268.

Hobson has not satisfied his burden of "show[ing] a violation of clearly established rights." *Hope*, 536 U.S. at 741.

To be sure, "it has long been recognized that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners.'" *Est. of Owens*, 660 F. App'x at 767 (quoting *Farmer*, 511 U.S. at 833). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Indeed, courts have repeatedly determined that prison conditions that encourage violence can support a finding of deliberate indifference. In *Farmer*, the Supreme Court considered a deliberate indifference claim raised by a biologically male prisoner who presented as female but was housed in the general population of a male prison despite officials' "knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that petitioner, as a transsexual . . . , would be particularly vulnerable to sexual attack by [other] inmates." 511 U.S. at 829–31. Notably, the Court did not require, as Valenza suggests, previous bloodshed to state a claim. (*See* doc. 63 at 35). Instead, the Court held that a plaintiff could simply allege "a sufficiently substantial '*risk* of serious damage *to his future health*.'" *Id.* at 843 (emphasis added) (quoting *Helling*, 509 U.S. at 35); *accord id.* at 845 ("[A] subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief.'" (quoting *Helling*, 509 U.S. at 33–34)); *see also Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) (indicating it is

33

sufficient for a plaintiff to allege prison "conditions that [a]re extreme and pose[] an unreasonable risk of serious injury to his *future* health or safety" (emphasis added)).

Of course, previous bloodshed is not irrelevant. *See, e.g.*, *Lane*, 835 F.3d at 1307–08; *Hale,* 50 F.3d at 1583; *LaMarca*, 995 F.2d at 1532–33; *Williams v. Edwards,* 547 F.2d 1206, 1211 (5th Cir. 1977); *Gates v. Collier,* 501 F.2d 1291, 1308–10 (5th Cir. 1974).[19] And claims reliant on a generalized risk of inmate-on-inmate violence without evidence of previous, serious assaults have failed. *Harrison v. Culliver*, 746 F.3d 1288, 1299–1300 (11th Cir. 2014); *Purcell ex rel. Est. of Morgan v. Toombs County*, 400 F.3d 1313, 1317–18, 1320–23 (11th Cir. 2005).

But though previous, serious assaults are a fair proxy for risk, the Eleventh Circuit has explicitly held that they are *not* required.[20]  In *Marsh v. Butler County*, the Eleventh Circuit, sitting en banc, held that the failure to allege that the prison "had a history of inmate assaults with serious injuries" was not dispositive, and that "no reasonable sheriff could have concluded that the alleged conditions at the Jail failed to pose a substantial risk of serous harm, *although no serious injury was alleged to have occurred at the Jail before the*

---

[19] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[20] Valenza and the Commission attempt to mold the deliberate indifference inquiry to require Hobson to show the Jail was a place "where violence and terror reign." (*See, e.g.*, doc. 55 at 21; doc. 57 at 10, 15; doc. 63 at 32; doc. 65 at 4, 18; doc. 71 at 5).  But that heuristic does not control where the plaintiff points to "specific features of a facility" that pose a substantial risk of serious harm to prisoners. *See Marbury v. Warden*, 936 F.3d 1227, 1234–35 (11th Cir. 2019); *Dickinson v. Cochran*, 833 F. App'x 268, 274–75 (11th Cir. 2020); *Brown v. Dunn*, 760 F. Supp. 3d 1326, 1340 (M.D. Ala. 2024).  Indeed, even before *Wade* (which was decided in July 2024 and so cannot be considered for purposes of clearly established law here), Eleventh Circuit precedent discussed in this section permitted plaintiffs in Hobson's predicament to bring deliberate indifference cases on unsafe facility conditions which also involved inmate-on-inmate violence.

*injuries suffered by Plaintiffs*." 268 F.3d at 1034 (emphasis added).  In that case, the

conditions that constituted a substantial risk of serious harm were summarized as follows:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

*Id.* at 1029.[21]

---

[21] *Marsh* also summarized the facts in *Hale* sufficient to constitute a substantial risk of serious harm as: "1) prisoners were not segregated based on their proclivity for violence, 2) there was only one jailer on duty, 3) the jailer's quarters were out of earshot and eyesight of the prisoners' cell, and 4) fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization." 268 F.3d at 1033 n.12.

It did the same of *Williams*: "1) widespread possession of weapons, 2) no confiscation of weapons, 3) no segregation of violent from nonviolent inmates, 4) previous assaults, 5) overcrowding, 6) too few guards to supervise properly inmates, and 7) multiple reports of stabbing, some resulting in death." *Id.*

And of *Collier*: "1) possession of weapons by prisoners, 2) no established procedure for confiscating weapons, 3) lack of classification according to severity of offense, 4) no procedure for reporting previous assaults, 5) overcrowding, 6) lack of supervision by guards, 7) custodial responsibility assigned to incompetent and untrained inmates, and 8) at least 27 reported instances of armed assaults by inmates on other inmates." *Id.*

The Eleventh Circuit has since decided *Purcell ex rel. Estate of Morgan v. Toombs County*, where the plaintiff argued a substantial risk of serious harm arose from "inmates [being] allowed to keep money in their cells; inmates [being] allowed to play cards and gamble; the physical layout of the Jail hindered guards from preventing inmate-on-inmate attacks; and a history of inmate-on-inmate fights." 400 F.3d at 1320.

> Inmates at Toombs County Jail were segregated based on a number of particularized factors, including the kind of crime committed and an inmate's potential personal conflicts with others. Moreover, the Jail was not understaffed on the night of the attack: five officers were on duty, which is typical for Toombs County. Jail officials had a history of punishing inmate violence, rather than looking the other way to preserve the status quo. And while inmate fighting does happen in Toombs County, the record is insufficient to show that serious inmate-on-inmate violence was the norm or something close to it. Also, the fights that did occur were linked to no recurring specific cause: causes ran the gamut from disagreements over television channels, to retaliation for pre-incarceration street activity, to card games, to food.

> Purcell has produced evidence . . . that a few serious fights occurred (severe enough to result in a trip to the hospital) at the Jail before Matthew Morgan's attack. No record evidence, however, shows that those incidents related to money. . . .

> The record evidence, at worst, shows that the physical layout of the Jail presented the jailers with difficulty in seeing into certain inmate cells, during the night, from the control tower. Guards also testified that they could not hear as well from inside the tower as they could when standing outside it. But in practice, the guards left the tower and walked around the cellblock area to conduct periodic checks; nothing suggests difficulty in seeing into the cells or hearing cell activity when walking around.

*Id.* at 1321–23. The court found no substantial risk of serious harm but explained that it did "not, by today's conclusion, establish . . . *Marsh* or *Hale* as the proverbial 'floor' of

36

liability for Eighth Amendment purposes.  We only decide that the conditions evidenced by the record here were not sufficiently grave to violate the Constitution." *Id.* at 1324.

The instant action exists in the twilight between these lines of cases.  The record indicates the conditions, detailed in the light most favorable to Hobson *supra* Part IV(A)(1)—while undeniably undesirable—were better than the conditions in *Marsh* but worse than those in *Purcell*.  Mindful that "[i]n deliberate-indifference cases, . . . context matters," *Mosley*, 966 F.3d at 1272 (citations omitted), and that "the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements," *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010), the Court cannot find the conditions at the Jail satisfy the objective prong of deliberate indifference under clearly established law in this context.  A reasonable official looking at the case law would not be able to say conclusively that "the unlawfulness" of the conditions at the Jail was "apparent" when the conditions there fell between[22] those giving rise to liability (*Marsh*, *Lane*, *Hale*, *LaMarca*, *Williams*, and *Collier*) and those which do not (*Purcell* and *Harrison*). *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  Necessarily then, existing precedent would not have placed the constitutional question of whether such conditions were objectively, sufficiently serious "beyond debate," *al-Kidd*, 536 U.S. at 741, and Hobson has thus not established Valenza's conduct violated clearly established law.

---

[22] Or perhaps "among," as the cases in this area are fairly characterizable as "a dog's breakfast of divided, conflicting, and ever-changing analyses." *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 267 (2007) (Roberts, C.J., dissenting); Oral Argument at 24:23–49, *Marbury v. Estes*, No. 24-13513 (11th Cir. Mar. 5, 2026), https://www.ca11.uscourts.gov/sites/default/files/oral_argument_recordings/24-13513_0505202 6.mp3 (Newsom, J., speaking) ("We've got this . . . dog's breakfast of cases, . . . *Marsh*, *Lane*, and *Purcell* . . . . And it just seems like an odd thing to say that . . . there's much we can take from it one way or the other.").

Because Hobson has failed to show that Valenza violated his clearly established constitutional rights, Valenza is entitled to qualified immunity. Consequently, Valenza's motion for summary judgment is due to be granted. Because Valenza is entitled to qualified immunity—and therefore summary judgment—when viewing the evidence in the light most favorable to Hobson, it follows that Hobson's motion for summary judgment is due to be denied as against Valenza.

## B.   The Commission

Because the Commission must itself be responsible for particular acts or omissions for liability to attach under §1983, the Court proceeds by examining the Commission's responsibilities before examining whether its acts or omissions constituted official policy. The Court then evaluates whether there are genuine disputes of material fact pertinent to Hobson's claim of deliberate indifference against the Commission.

### 1.   *The Commission's Responsibilities*

"In Alabama, counties possess only those powers expressly delegated to them by the legislature." *Ex parte Sumter County*, 953 So. 2d 1235, 1238 (Ala. 2006) (citing *Tuscaloosa County v. Ala. Great S. R.R.,* 150 So. 328 (Ala. 1933)). "Therefore, the Alabama Code determines the role of counties in operating county jails." *Id.* Alabama Code § 11-14-10 states: "The county commission shall erect . . . , jails, . . . , and [the] county commission shall have authority to levy a special tax for that purpose. Each county within the state shall be required to maintain a jail within their county." *Cf. Marsh*, 268 F.3d at 1027 ("Alabama counties have no responsibility for daily operation of county jails and no authority to dictate how jails are run, *but the County is charged with erecting and*

*maintaining jails*." (emphasis added) (footnote omitted) (citing *Turquitt v. Jefferson County*, 137 F.3d 1285, 1289–90 (11th Cir. 1998)).  The duty to maintain a jail "require[s] the county commission to keep a jail and all equipment therein in a state of repair to preserve it from failure or decline." *Keeton v. Fayette County*, 558 So.2d 884, 886 (Ala. 1989).  Jails must also "be of sufficient size and strength to contain and keep securely the prisoners which may be confined therein." ALA. CODE § 11-14-13.

Further, "[i]t is the duty of the county commission, if there is not a sufficient jail in its county, to levy a county tax for the erection thereof and cause proposals to be issued for . . . repairing the same within 12 months thereafter." *Id.* § 11-14-14.  Alabama takes this duty seriously, and affirmatively criminalizes the failure to comply. *Id.* § 11-14-15 ("If any county commission fails to levy a tax to erect or repair a county jail when necessary, the persons composing such county commission are severally guilty of a misdemeanor and must, on conviction, be fined not less than $50.00 . . . .").  Given the threat of criminal liability, Alabama provides counties tools to address jail issues on an expedited basis. *See id.* § 11-14-19 (imposing a duty on the chairman of the county commission to call impromptu meetings "[i]f there is a necessity[] and delay until the regular meeting of the county commission may be of injury to the health of the prisoners confined in the county jail").  The chairman is also "authorized and empowered . . . to visit and examine the condition of the jail[ and] to make a memorandum in writing of such examination" "without informing the sheriff or jailer" in advance. *Id.* § 11-14-22.

In light of the foregoing, the responsibility of the Commission to maintain the Jail (and, of course, its locks) is clear.

### 2.    *Funding Decisions as Policy*

As stated above, the Commission can only be liable if its refusal to provide funding to replace the locks at the Jail was a "policy," which is "a 'deliberate' or 'conscious' choice by a municipality." *Canton*, 489 U.S. at 389; *accord Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers . . . ."). Inaction, or a refusal to implement proper policy, can itself constitute policy for purposes of § 1983. *See Canton*, 489 U.S. at 389 ("[F]ailure to provide proper training may fairly be said to represent a policy for which the city is responsible."); *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) ("The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." (quotation omitted)). Here, liability arises only when the "constitutional violation is a 'highly predictable consequence' of the Commission's failure to budget (and hence, adequately [maintain]) the [Jail]." *McDowell*, 392 F.3d at 1292 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409–10 (1997)).

The Commission argues that Hobson's claim fails because he has not produced evidence that anyone acted as an official policymaker for Houston County. (*See* doc. 65 at 22–23). But Hobson need not identify one specific person; the Commission itself can satisfy that role. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (requiring "ident[ification of] those officials *or governmental bodies* who speak with final policymaking authority for the local governmental actor" (emphasis added)). Second, it is the Court which is tasked with that question of law. *See id.* ("[*T*]*he trial judge* must identify

those officials or governmental bodies . . . .").  Third, Hobson in fact did correctly identify the Commission as the body responsible for decisions related to Jail maintenance in his amended complaint and briefing. (*See* doc. 33 at 17, paras. 77–78; doc. 53 at 20; doc. 59 at 8; doc. 69 at 6); *see also* discussion *supra* Part IV(B)(1).

On this record, the Commission's decision not to fund the replacement of locks at the Jail amounts to an official policy of the County.  Therefore, the Court proceeds to the deliberate indifference inquiry and examines whether there are genuine disputes of material fact that preclude summary judgment for the Commission and Hobson on the Commission's liability.

### 3.    *Deliberate Indifference*

"[T]he [Commission] will have violated [Hobson's] [Fourteenth] Amendment rights if its failure to maintain the Jail constituted deliberate indifference to a substantial risk of serious harm to the [pretrial detainees]." *Marsh*, 268 F.3d at 1027.  As discussed above, there is a genuine dispute of material fact as to the objective prong of deliberate indifference. *See* discussion *supra* Part IV(A)(1).  Because the objective prong does not change based on the defendant, the Court pretermits further discussion on the point and proceeds to examine the subjective prong, the Commission's response, and causation. Ultimately, the Court determines that a genuine dispute exists as to these elements, too, such that granting either party summary judgment is inappropriate.

The Commission argues that Hobson has—at most—only shown that Chairman Shoupe knew of the issue with the locks—not the Commission itself.[23] (*See* doc. 65 at 21–23). Nevertheless, Alabama law vests the Chairman, not individual commissioners, with the authority to examine the Jail, ALA. CODE § 11-14-22, and the *duty* to set special Commission meetings where "delay until the regular meeting . . . may be of injury to the health of the prisoners," *id.* § 11-14-19. Alabama law renders Chairman Shoupe the eyes and ears of the Commission for the purposes of monitoring the Jail, and the evidence adduced at this stage shows that he, in fact, personally knew of the issues with the locks at the Jail.

Aside from Shoupe, there is also evidence that the remainder of the Commission had direct knowledge of this issue. Brazier told Captain Ivey, who sat on the Commission, that there were issues with the locks. (*See* doc. 56-2 at 21:15–22 ("[I] kept telling him 'We need to get these locks fixed . . . as soon as you can' because, . . . things are going to start failing.")). Valenza admitted that prior to Hobson's injury he informed *the Commission* that the locks in the Jail "were not functioning properly and need[ed] to be replaced and/or repaired." (Doc. 52-4 at 5, para. 4; *see also id.* (Valenza's admission that he notified the Commission prior to the assault on Hobson that the Jail's locks "created an unreasonably dangerous situation for the inmates and [Jail] staff"). Valenza also stated that for two years

---

[23] The Commission tries to have it both ways on this point—stating that Chairman Shoupe's knowledge of issues with the Jail cannot be imputed to the Commission writ large while also attempting to adopt Chairman Shoupe's actions as a reasonable response by the Commission to any risk. (*See* doc. 65 at 25–27). Recall also that the Chairman is intimately involved with the funding and maintenance of jails and votes with the other Commissioners—acting as part of the decision-making body—when they are deadlocked.

before the incident, "we requested [the Commission] to have th[e] locks changed." (Doc. 56-1 at 63:3–20; *see also id.* at 64:14–16 ("Chairman Shoupe was brought aware of it. And I have two deputies on the [C]ommission also."); *id.* at 65:24–66:6 (Valenza's testimony that he communicated to the Commission the severity of the issue and "showed [the Commission] videos" related to the problem)). Valenza's testimony is that he specifically told two members—if not all four—as well as the Chairman, who can cast a tie-breaking vote. Accordingly, a reasonable jury could conclude that a quorum of the Commission required to pass funding measures was subjectively aware that the conditions at the Jail posed a substantial risk of serious harm.

Rafferty likewise testified that the Sheriff's Office had tried to address the issues with the locks by notifying the Commission: "[W]e've been trying to get it fixed. [We] . . . went to the [C]ommission, the chairman, the chief financial officer . . . and *it had been being addressed with the boards* over a period of time." (Doc. 56-3 at 48:17–49:15 (emphasis added)). Shoupe's declaration confirms that every funding request related to the issue—which Rafferty referenced as beginning potentially as far back as 2014—would have been considered by the Commission. (*See* doc. 64-1 at 6, para. 23 (stating that "neither [he] nor any member of the Commission ever turned a blind-eye towards any funding request made by the Sheriff" and that in budgeting "the Commission relies upon all information available, countywide" to decide funding).

For his part, Shoupe also acknowledged that on July 25, 2023, Rafferty sent two emails *to the Commissioners*. (Doc. 64-1 at 3, para. 9). The first was of "an inmate(s) popping a jail cell door lock," with a message forwarded from Asbill that stated: "This was

43

done at night after roll in. A single deputy did patrol rounds later that evening placing them at risk." (Doc. 64-2 at 1). Rafferty opined to the Commission that "[i]t is believed d[ue] to no inmates being out of the cells during this time [that] the inmates were setting up and waiting for a Corrections Deputy to enter the pod and attack." (*Id.*). The second email contained a video of "inmates that popped the[ir] cell door locks and attacked other inmates." (Doc. 64-3). Accordingly, several months before the attack on Hobson, the Commission itself was provided video evidence highlighting the danger posed by the locks.[24] Chairman Shoupe stated after Hobson's attack, "[w]e *do have serious ongoing safety concerns, not only for our inmates* but for our jailers that work in the [J]ail, so we have to do something. *We've known about this for a long time*." (Doc. 52-7 (emphases added)). Additionally, testimony from Valenza and several Jail staff members also implies that the issue had gone on for years. This evidence, if believed, further supports a finding that the Commission had actual knowledge of the substantial risk of serious harm posed to inmates at the Jail by the nonfunctioning locks. (*See, e.g.*, doc. 56-2 at 17:15–18:10; doc. 56-3 at 43:20–22; doc. 56-9 at 16:7–16; doc. 62-2 at 120:13–19); *see Wilson*, 501 U.S. at 300; *Marsh*, 268 F.3d at 1030. At the very least, a jury could draw the reasonable inference that the Commission was subjectively aware of the issue with the locks. *See Anderson*, 477 U.S. at 255; *Chavez*, 701 F.3d at 899.

---

[24] The Commission ignores this fact, claiming Hobson "didn't depose a Rule 30(b)(6) representative of the Commission[ or] any member of the Commission other than Chairman Shoupe . . . . He doesn't offer any minutes of the Commission to show knowledge. Instead, he simply argues that the Commission should have known that prisoners could manipulate locks in the [J]ail." (Doc. 72 at 5). In light of Rafferty's testimony about a video of inmates attacking a deputy, shown at an annual budget meeting with all the commissioners, and the videos of inmates popping the locks to their cells, emailed to all members of the Commission, a jury could reasonably infer knowledge on the part of the Commissioners.

The Commission argues that, even if it had subjective awareness of the issue, it responded reasonably by investigating replacement of the locks in A and M dormitories, (*see* doc. 65 at 27–28), citing evidence that the Jail lock issue predominantly plagued those dormitories, (doc. 64-16 at 3, para. 9). But this evidence conflicts with evidence presented by Hobson that the conditions at the Jail were pervasive and unpredictably affected cells throughout. Regardless, it is undisputed that the Commission did nothing to address the locks in J dormitory, an area used to hold detainees with disciplinary infractions, *including infractions for popping locks*. Additionally, it is undisputed that the Commission knew of the issue with the locks no later than July 24, 2023, when Rafferty put all Commissioners on notice with video evidence of detainees popping their locks. Even still, the Commission did not replace any locks by the time Hobson was attacked—almost seven months later. Hobson has presented sufficient evidence for a reasonable jury to find that the Commission failed to respond reasonably to a substantial risk of serious harm posed by the nonfunctioning locks. In particular, Hobson presented evidence from which a reasonable jury could conclude that the Commission knew of—but disregarded—a reasonable measure to abate the risk in J dormitory: replacing the locks. *Cf. Hale*, 50 F.3d at 1584;

*LaMarca*, 995 F.2d at 1536.[25]  On the other hand, viewing the evidence in the light most favorable to the Commission, a reasonable jury could find that the replacement of locks in A and M dormitories was a step toward replacing the locks throughout the Jail, including in J dormitory, and therefore that the Commission responded reasonably.  For that reason, a jury, not the Court, is the proper entity to determine whether the Commission complied with the Fourteenth Amendment by "'tak[ing] reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).

Finally, Hobson has presented sufficient evidence for a reasonable jury to find in his favor on the issue of causation—that his injury was a "highly predictable" or "plainly

---

[25] The Commission disputes Hobson's reading of *LaMarca* as standing for the proposition that "maintaining the status quo after learning existing measures are ineffective supports a finding of deliberate indifference." (Doc. 72 at 6 (quoting doc. 69 at 6) (quotation marks omitted)).  The Court agrees with the Commission that Hobson reads *LaMarca* too favorably to his position.  *LaMarca* stands for the proposition that "if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent *unless he knows of, but disregards, an appropriate and sufficient alternative*." 995 F.2d at 1536 (emphasis added).  Far from penalizing mere continuance of the status quo, *LaMarca* requires that a defendant have knowledge of and disregard an alternative remedy to the risk.  The trouble for the Commission is that Hobson has presented sufficient evidence for a reasonable jury to make that finding, and so Hobson's misreading of *LaMarca* is not fatal.

obvious consequence" of the Commission's ongoing policy not to fund the replacement of locks in J dormitory.[26] *McDowell*, 392 F.3d at 1292; *Brown*, 520 U.S. at 411.

Asbill testified—and reason confirms—that detainees throughout the United States will attempt to escape confinement, including their cells. (Doc. 56-7 at 69:13–19).   In carceral settings—"necessarily dangerous places[ that] house society's most antisocial and violent people in close proximity with one another," *Farmer*, 511 U.S. at 858 (Thomas, J., concurring)—one would have to shelve common sense to believe that those individuals will not attempt to leave cells that lack functioning locks or that they will live peaceably once beyond the confines of their cell. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 336 (2012) ("Jails can be even more dangerous than prisons because officials there know so little about the people they admit at the outset." (citation omitted)); *United States v. Prevo*, 435 F.3d 1343, 1346 (11th Cir. 2006) ("Because of the character of prisoners and the nature of imprisonment, corrections facilities are volatile places, brimming with peril, places where security is not just an operational nicety but a matter of life or death importance."); *Nelson v. Tompkins*, 89 F.4th 1289, 1301 (11th Cir.) (Abudu, J., concurring) ("Prisons and jails are widely known to be one of the most

---

[26] The Commission argues that Hobson's theory of policy fails as a matter of law because he fails to tie a funding decision by the Commission to his injury. (*See* doc. 57 at 16; doc. 65 at 28–29); *accord Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 944 (11th Cir. 2017) ("To survive summary judgment, [the plaintiff] must produce sufficient evidence that a policymaker's specific budget decision was highly likely, and not simply more likely, to inflict a particular injury."). The Court disagrees. Hobson ties *the ongoing decisions* of the Commission not to fund the replacement of locks at the Jail to the particular, substantial risk of serious injury—assault by another inmate. (*See* doc. 53 at 20 (citing evidence of, *inter alia*, "[y]ears of malfunctioning cell-door locks," "[r]epeated requests . . . to the . . . Commission for funding to repair or replace the system," "[p]rior . . . assaults resulting from lock failures," and the Chairman's "public admission that the issue presented 'serious ongoing safety concerns'"); doc. 59 at 8 (citing "[t]he Commission's failure to address known lock failures" as the direct cause of Hobson's injury); doc. 69 at 6 (framing the issue as "the Commission's failure to timely fund")).

dangerous housing situations in the world."), *cert. denied sub nom. Sellers v. Nelson*, 145

S. Ct. 178, (2024); *id.* at 1306 (Carnes, J., concurring) ("Prisons and jails are inherently

dangerous places." (citation omitted)).

Again, J dormitory housed individuals with disciplinary infractions, including for

popping locks. Brazier, Rafferty, and Valenza testified that the Commission was made

aware that the locks throughout the Jail were not functioning as intended and that the issue

with the locks posed a substantial risk of serious harm to both jailers and detainees alike.

It was apparent, then, to those working at the Jail that if the current locks were not replaced,

there was a potential for serious injury.[27]

For at least seven months, and maybe more than a decade, the Commission

maintained a policy of not replacing the locks at the Jail. The situation was variously

described as: "a recipe for disaster" (Valenza); "a dangerous condition for the inmates"

(Brazier); a source of "too many problems" and "a safety risk for not only other inmates

but also [the Jail staff]" (Moore); "unsafe" (Murphy); or "a major concern . . . [for] the

safety of [the] inmates" (Rafferty). The Commission itself acknowledges that prisoner-on-

prisoner violence "arose" from the manipulation of the inadequate locks. (*See* doc. 65 at

---

[27] The Commission argues that even if it "started the process to replace every lock in the Jail on [June 3, 2023—the first available recorded incident of detainee-on-detainee violence arising from the lock popping], the repairs wouldn't have been completed in time to prevent the attack on Hobson." (*See* doc. 65 at 28–29). This argument misses the mark. If the Commission had begun the process of replacing the locks prior to Hobson's attack, they might well have responded reasonably to the substantial risk of serious harm in their limited role as maintainers of the Jail. *See Wade*, 106 F.4th at 1255. However, the Commission took no steps to replace the locks in J dormitory prior to Hobson's assault. Accordingly, the Court is not persuaded that the Commission did not "cause" the substantial risk of serious harm that ultimately befell Hobson simply because they did not respond to the risk earlier.

29 ("The first incident of prisoner-on-prisoner violence [that] arose from manipulation of cell locks occurred on June 3, 2023.")).

What these general recognitions of incarceration in the United States and specific characterizations of incarceration at the Jail indicate is that Hobson's injury was a highly predictable or plainly obvious consequence of the Commission's consistent policy of not funding the Jail's replacement of the locks after learning of their deficiency. Hobson has thus provided sufficient evidence that the Commission's ongoing decisions not to fund the replacement locks was the "moving force" behind his constitutional injury. *See Monell*, 436 U.S. at 694; *cf. McDowell*, 392 F.3d at 1291–92 (concluding that a county was not liable under § 1983 based on the county's budget decision, which caused understaffing, because the county's decision was not the "moving force" behind the detainee-plaintiff's injury).[28]

In sum, a reasonable jury crediting Hobson's version of events could conclude that the Commission was subjectively aware of the substantial risk of serious harm in

---

[28] Briefly, the Commission also suggests that even if even if it was aware the situation created a substantial risk of serious harm throughout the prison, its attempt to replace locks in some dormitories before replacing all locks in the prison due to budgetary concerns was reasonable. (*See* doc. 65 at 7–8). But policy concerns do not control the meaning of deliberate indifference:

> The United States suggests that a state-of-mind inquiry might allow officials to interpose the defense that, despite good-faith efforts to obtain funding, fiscal constraints beyond their control prevent the elimination of inhumane conditions. Even if that were so, it is hard to understand how it could control the meaning of "cruel and unusual punishments" in the Eighth Amendment. An intent requirement is either implicit in the word "punishment" or is not; *it cannot be alternately required and ignored as policy considerations might dictate*.

501 U.S. at 301–02 (emphasis added). To the extent that the Commission's argument concerns feasibility, the Court observes that the Commission was in fact able to obtain money to pay for replacements throughout the Jail when it finally determined to replace all the locks.

J dormitory caused by its decision not to fund replacement of the locks at the Jail, and that the Commission failed to respond reasonably to that risk. Therefore, the Commission's motion for summary judgment is due to be denied. However, if a jury credits the Commission's version of events, said jury could reasonably conclude that the Commission did respond reasonably to the risk.[29] Consequently, Hobson's motion for summary judgment is also due to be denied as against the Commission.

### V.  CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1.      Hobson's motion for summary judgment, (doc. 52), is DENIED.

2.      Valenza's motion for summary judgment, (doc. 61), is GRANTED.

3.      The Commission's motion for summary judgment, (doc. 64), is DENIED.

DONE this 4th day of August, 2026.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

---

[29] Because a reasonable jury crediting the Commission's version of events could find in the Commission's favor regarding the reasonableness of its response, thereby precluding summary judgment in favor of Hobson, the Court in its discretion pretermits discussion of whether a reasonable jury could also find in the Commission's favor on any other deliberate indifference elements.